```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION


LAMYA FATTAH,                    )
                                 )
            Plaintiff,           )
                                 )
       v.                        )      No. 4:07 CV 560 DDN
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of                  )
Social Security,                 )
                                 )
            Defendant.           )
```

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Lamya Fattah for supplemental security income under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381 et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 4.) For the reasons set forth below, the decision of the ALJ is affirmed.

## I. BACKGROUND

Plaintiff Lamya Fattah was born on March 1, 1963. (Tr. 349.) She is 5'4" tall with a weight that has ranged from 170 pounds to 195 pounds. (Tr. 130, 516.) She completed nine years of school and last worked as a machine operator for three months in 1998. (Tr. 22-23.)

On November 18, 2004, Fattah applied for supplemental security income, alleging she became disabled on November 1, 2004, as a result of ear, back, and vision problems. (Tr. 11, 80-83.) The claim was initially denied on February 16, 2005. (Tr. 48.) Following a hearing on August 24, 2006, the ALJ denied benefits on September 22, 2006. (Tr. 8, 18-19.) On January 25, 2007, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2.)

## II. MEDICAL HISTORY

In a disability report, Fattah stated she could not speak, read, or write in English. She noted suffering from back pain, blurred vision, ear infections, and dizziness, which limited her ability to work, caused her pain, and left her feeling tired all the time. These impairments first started on November 1, 2004. She last worked as a machine operator, for a few months in 1998. As part of the job, she cleaned and separated plastic bags. She worked eight hours a day, five days a week. She spent eight hours a day walking, standing, and handling or grasping objects. She did not lift anything as heavy as ten pounds. (Tr. 130-39.)

On May 10, 2001, Fattah visited Barnes-Jewish Hospital, complaining of bad knee pain. The left knee pain had started four months ago, and went from her knee down to her heel. The right knee pain had started about two and a half weeks earlier. Fattah denied any prior knee injuries. She did not have any swelling or erythema.[1] Sitting and standing aggravated the pain, while walking relieved it. She had a full range of motion. (Tr. 687-88.)

On August 16, 2001, Fattah received prenatal care. An interpreter was present to facilitate the exam.[2] She reported dizziness and nausea, but was able to plan meals, buy food, and prepare food herself. (Tr. 671-74.)

On February 21, 2002, Fattah was diagnosed with a history of Hepatitis B.[3] The doctor's notes indicate the previous diagnosis of Hepatitis E was incorrect.[4] Fattah did not have any Hepatitis infection at present. (Tr. 612.) That same day, Fattah was instructed on how to

---

[1]Erythema is inflammatory redness of the skin. Stedman's Medical Dictionary, 533 (25th ed., Williams & Wilkins 1990).

[2]Almost all of Fattah's medical exams and visits were with the aid of an interpreter.

[3]Hepatitis is inflammation of the liver, usually from a viral infection, but sometimes from toxic agents. Stedman's Medical Dictionary, 704.

[4]On August 30, 2001, the notes on a chart read "Hepatitis E (Not B)." (Tr. 649.)

maintain a proper diet for her diabetes. At the time, she was taking Glyburide.[5] (Tr. 613.)

On March 15, 2002, Fattah went to Barnes-Jewish Hospital for a pre-anesthetic assessment. She had no cardiovascular, respiratory, or neuromuscular abnormalities. She was diagnosed with diabetes mellitus, with poor control. (Tr. 516-20.)

On August 20, 2002, Fattah underwent a CT scan of her spine and left knee. The scan revealed "normal alignment of the vertebral bodies of the lumbar spine."[6] There was no vertebral fracture, dislocation, or evidence of degenerative disk disease along the lumbar spine, though there was some straightening. The scan revealed no fracture, dislocation, narrowing, effusion, or other evidence of degenerative changes, within the left knee.[7] (Tr. 826.)

On December 26, 2002, Fattah went to Barnes-Jewish Hospital, complaining of lower back pain, and right knee and leg pain. She indicated the pain was worse in the morning, but would improve with time, usually after fifteen or thirty minutes. A physical examination showed no knee effusion and ligament testing was negative. There was no back tenderness. The doctor recommended conservative treatment for her knee and back pain, and prescribed Ibuprofen and Tylenol. The notes indicate Fattah refused physical therapy, because she did not have a babysitter. Fattah had no complaints of a urinary tract infection (UTI). (Tr. 501.)

---

[5]Glyburide is used to control high blood sugar. http://www.webmd.com/drugs. (Last visited February 12, 2008).

[6]The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2.

[7]Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity. Stedman's Medical Dictionary, 491.

On February 24, 2004, Fattah went to Barnes-Jewish Hospital, for a follow-up. She denied feeling lightheaded, and denied any hearing loss or dizziness. A physical examination showed her lungs were clear, her heart rate and rhythm were regular, and her abdomen was soft. She was in no acute distress ("NAD"). (Tr. 472.)

On May 18, 2004, Fattah went to Barnes-Jewish Hospital, complaining of pain in her back and side, estimated at 7/10. She noted nothing caused the pain and nothing helped the pain. (Tr. 458.)

On July 28, 2004, Fattah went to Barnes-Jewish Hospital, complaining of right ear pain. She had no ear drainage or headaches. A physical examination showed the right tympanic membrane was clear, but there was a small red ulceration in the ear canal, with slight wax build-up.[8] The left tympanic membrane had some old scarring. There was no pain on external ear manipulation. The doctor prescribed drops for her ear. (Tr. 452.)

On September 30, 2004, Fattah underwent a CT scan of her right ear. The scan revealed an ear infection with partial darkening of the right middle ear cavity, but no evidence of cholesteatoma.[9] There was no evidence of osseous destruction or mastoiditis in the middle ear.[10] (Tr. 431.)

On October 14, 2004, Fattah went to Barnes-Jewish Hospital, complaining of a right tympanic membrane rupture and feeling pressure in her right ear. The notes indicate she had four bladder infections

---

[8]The tympanic membrane is the membrane of the eardrum, and constitutes the boundary between the external and middle ear. The membrane is covered with epithelium on both surfaces. Stedman's Medical Dictionary, 940. An ulcer is a lesion on the surface of the skin, caused by superficial loss of tissue, usually with inflammation. Id., 1661.

[9]A cholesteatoma is a tumor-like mass of squamous epithelium and cholesterol in the middle ear, usually resulting from chronic otitis media. Stedman's Medical Dictionary, 296. Otitis media is inflammation of the middle ear. Id., 1112.

[10]Mastoiditis is an infection of the mastoid bone of the skull, and is usually the consequence of a middle ear infection. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/001034.htm (Last visited February 12, 2008).

in the past year. Fattah denied any chest pain, palpitations, or shortness of breath. (Tr. 390-91.)

On October 22, 2004, Fattah underwent a right tympanoplasty to correct a perforated tympanic membrane with cholesteatoma.[11] The surgery revealed no evidence of dehiscent facial nerve.[12] After the surgery, the notes indicate Fattah was not in pain, was able to walk to the bathroom, and could dress herself. (Tr. 400-16, 422-23.) Upon discharge, Fattah complained of left hip pain, 3-4/10. A psychosocial examination showed she was alert, calm, and oriented. Her speech was normal, she was able to follow simple commands, and had a steady gait. The nursing assessment indicates she was oriented, able to walk, could take deep breaths, and had minimal nausea, vomiting, or dizziness. (Tr. 417-19.)

On October 25, 2004, a pathology report indicated Fattah had stratified squamous epithelium and chronic inflammation in her right ear. (Tr. 864.)

On November 18, 2004, Fattah applied for supplemental security income. She noted receiving welfare and food stamps, but had no other source of income. (Tr. 80-83.)

On November 23, 2004, Fattah complained of a sensation of pressure in her right ear. There was no pain, and there was no drainage or change in hearing in that ear. A physical examination showed her right tympanic membrane was intact. (Tr. 370.)

On December 8, 2004, Fattah completed a work history report.[13] From August 1998 to November 1998, she worked as a machine operator, for a plastic company. She worked eight hours a day, taking plastic bags and plates from a machine. As part of the job, she would stand and crouch, frequently lift ten pounds, and occasionally lift up to twenty pounds. This is the only job she has ever done. Otherwise, she has

---

[11]A tympanoplasty is an operation to correct a damaged middle ear. Stedman's Medical Dictionary, 1658.

[12]Dehiscence is a bursting open or splitting along natural or sutured lines. Stedman's Medical Dictionary, 408.

[13]Fattah appears to have completed this form herself.

-5-

been a housewife, "helping [her] disabled husband at home." (Tr. 120-27.)

On December 13, 2004, Fattah went to Barnes-Jewish Hospital, complaining of occasional pelvic pain and back pain. The risk screening notes indicate her appetite was good. The notes also indicate Fattah was able to cook, clean, bathe, and shop. (Tr. 346.)

On December 13, 2004, Fattah completed a function report.[14] In a typical day, she would spend most of her day laying down and watching television. She would care for her disabled husband until 2:00 p.m., which was when her children returned from school. She was always dizzy, which made dressing and bathing more difficult. Her daughter would help her prepare meals and care for her hair. Fattah did not prepare her own meals, drive, leave the house often, attend church, or go shopping. She could not pay bills or handle money because of her dizziness. She could only walk one block before requiring two minutes of rest. Her dizziness affected her ability to follow instructions, and every one of the abilities listed in the function report, except squatting. (Tr. 111-118.)

On December 15, 2004, Fattah went to the Women's Wellness Center at Barnes-Jewish Hospital, complaining of lower back pain and pelvic pain for the last two months. A physical examination showed she was well-nourished, her thyroid was normal, her heart and respiration were normal, her abdomen was nontender, and her skin was normal. She had normal reflexes and was oriented. She had a UTI and was prescribed antibiotics and instructed on proper hygiene. (Tr. 349-51.)

On February 1, 2005, Dr. Fedwa Khalifa, M.D., summarized Fattah's present conditions. Dr. Khalifa noted Fattah's problems with nausea and dizziness. Fattah noted that the surgery to repair her perforated tympanic membrane had only aggravated her dizziness. While dizzy, Fattah noted blurred vision. She had recurrent UTIs, with at least five episodes of UTIs associated with flank pain and burning urine. She also noted a stabbing back pain that radiated to her right leg. The pain would wake her up at night and limited her ability to stand or sit for prolonged periods. She was no longer able to grocery shop, cook, or do

---

[14]Mohammed Baban completed the form on Fattah's behalf. (Tr. 118.)

-6-

laundry. In 1995, she had a Hepatitis B infection. A physical examination showed Fattah was alert and well oriented. The cranial nerves were intact, but Fattah could not follow Dr. Khalifa's finger with her eyes, because of her dizziness. Her lungs were clear, her abdomen was soft, with mild suprapubic tenderness, and her back had tenderness in the lower spine. The extremities were all within normal limits, with no swelling or deformities. (Tr. 869-72.)

A musculoskeletal examination showed Fattah had limited flexion of her shoulders because of the dizziness. She reported feeling dizzy when she moved her hands above her head. There were no problems with her elbows, wrists, or knees. Her muscle and grip strength were within normal limits. Hip flexion caused back pain, and any head movements increased her dizziness. A neurological examination showed normal sensation and full muscle strength. She had a normal gait, but could not stand or walk on her heels because she felt off balance. (Tr. 871-75.)

Based on the examination and Fattah's statements, Dr. Khalifa diagnosed her with dizziness, blurred vision, and a decrease in hearing. She believed Fattah's dizziness was getting worse, and any neck movements, eye movements, or shoulder movements would cause increasing dizziness. Dr. Khalifa added that Fattah "will have to be cautious when walking because any sudden turn will increase her dizziness." Dr. Khalifa also diagnosed her with recurrent UTIs and a past episode of Hepatitis. (Tr. 871-72.)

On February 9, 2005, Fattah underwent a binocular video oculography.[15] The test showed Fattah had rightward nystagmus, which suggested "peripheral vestibular [inner ear] dysfunction with the left ear being weaker than the right."[16] Central ocular motor function was intact and headshake testing was withing normal limits. Fattah refused caloric testing, which is used to test for peripheral lesions. (Tr. 293-95.)

---

[15]An oculography is a method of recording eye position and movements. Stedman's Medical Dictionary, 1079.

[16]Nystagmus is rhythmical oscillation of the eye-balls, either pendular or jerky. Stedman's Medical Dictionary, 1074.

-7-

On February 9, 2005, Fattah completed a dizziness and balance questionnaire. She described feeling a lightheaded dizziness all the time, but noted it was worst when first waking up in the morning and in the evening. The dizziness began after undergoing her first tympanoplasty. Fattah noted a spinning sensation, feeling dizzy when standing up quickly, and headaches. She noted a fullness and difficulty hearing in her right ear. (Tr. 850-53.)

On February 16, 2005, Charles Herrmann, a disability determination services examiner, completed a physical residual functional capacity assessment for Fattah. Fattah's alleged impairments were chronic ear inflammation, urinary tract infection, dizziness, and back pain. According to Herrmann, Fattah could occasionally lift up to fifty pounds, frequently lift up to twenty-five pounds, and could stand, walk, or sit, for six hours in an eight-hour workday. Herrmann also believed Fattah could perform unlimited pushing or pulling, frequently climb stairs, stoop, kneel, crouch, and crawl. She could occasionally balance. She did not have any manipulative, visual, or communicative limitations. Herrmann based these estimates on Fattah's medical history and only "partially credible complaints of dizziness and back pain from UTI's [sic]." In particular, Fattah's alleged impairments were inconsistent with her medical reports, in which she noted improved hearing and no dizziness. Herrmann found Fattah had some hearing loss in her right ear, but did not believe the hearing loss posed a significant loss of function. (Tr. 102-09.)

On March 10, 2005, Fattah completed a disability report appeal.[17] She did not have any changes in her conditions since the last disability report, but reported now suffering from memory loss. She could not shower without assistance, and could put her clothes on, only while sitting down. "I remain substantially impaired," she wrote. At the time, she was taking Hydrocodone and Metronidazole for her pain, Floxin for her ears, and Sudafed and Suphedirine for decongestion. There were no side effects from the medication. Another ear medication made her

---

[17]Frank Niesen, Jr., Fattah's attorney, completed this form on her behalf. (Tr. 98.)

heart race and made her dizzy, but she could not remember the name of the medication. (Tr. 92-98.)

On June 1, 2005, Fattah underwent a CT scan of the temporal bones. The scan showed the darkening had cleared. There was no fluid or soft tissue in either middle ear cavity. The ossicles and inner ear structures of each ear appeared normal. The tympanic membranes were unremarkable and there was no external auditory canal abnormality. (Tr. 301.)

On June 24, 2005, Fattah underwent a right tympanoplasty. There were no complications and she tolerated the procedure well. (Tr. 838-39.) On June 30, 2005, Fattah went to Barnes-Jewish Hospital, for a follow-up of her tympanoplasty. She had no complaints and no pain, but noted her right ear felt "full." A physical examination showed her left ear was clear. (Tr. 270.)

On September 20, 2005, Fattah went to Barnes-Jewish Hospital, complaining of suprapubic pain, with mild frequency. The notes indicate she had been previously treated for a UTI with Bactrim, which had relieved her symptoms, though now they had recurred. A physical examination showed Fattah was in no acute distress, her lungs were clear, her abdomen was soft and nontender, and she had no edema.[18] (Tr. 245.) That same day, Fattah underwent a colonoscopy, which revealed a single large diverticulum in the cecum.[19] The remainder of the colon was normal. (Tr. 254-55.)

On October 6, 2005, Fattah went to Barnes-Jewish Hospital, complaining of right heel pain. The heel pain was constant, and only partially resolved with Tylenol. The notes indicate her UTI symptoms had resolved. (Tr. 238.)

On October 11, 2005, Fattah went to Barnes-Jewish Hospital, complaining of constant throbbing and pressure on the right side of her face. Fattah also complained of right tinnitus, occasional dizziness

---

[18]Edema is an accumulation of watery fluid in cells, tissues, or cavities. Stedman's Medical Dictionary, 489.

[19]A diverticulum is a pouch or sac opening from a tubular organ. Stedman's Medical Dictionary, 460. The cecum is part of the large intestine. Id., 264.

-9-

with loss of balance, and losing hearing in her right ear.[20] She denied any vertigo. (Tr. 229.)

On October 20, 2005, Fattah underwent a CT scan of the temporal bones. The scan showed the right ossicles appeared normal. The right tympanic membrane was not thickened, and there was nothing to suggest cholesteatoma. The left ossicles and left tympanic membrane also appeared normal. (Tr. 299.)

On November 29, 2005, Fattah saw Dr. Mariana Chavez-McGregor, complaining of right heel pain. Fattah described the pain as constant, but unrelated to walking. There was no swelling. Dr. Chavez-McGregor noted Fattah's history of UTIs, though she was asymptomatic during the visit. A physical examination showed her lungs were clear, and her abdomen was nontender. Dr. Chavez-McGregor diagnosed Fattah with bursitis of the heel and prescribed Naproxen and Tylenol.[21] Dr. Chavez-McGregor ordered an x-ray of Fattah's heel, but believed the x-ray would be normal. (Tr. 207-09.) A radiograph of Fattah's foot showed there was a small plantar calcaneal spur, but no fracture or dislocation.[22] (Tr. 297.)

On December 20, 2005, Fattah visited Barnes-Jewish Hospital. Her most recent audio test, in October 2005, showed a marked decline in the baseline, when compared to a previous test in March 2005. During the visit, doctors recommended that she have a middle ear exploration to exclude recurrent cholesteatoma. Fattah declined to have another surgery. (Tr. 199.)

On January 5, 2006, Fattah saw Dr. Charles Lieu, M.D., for a follow-up. Dr. Lieu noted that Fattah's heel pain was resolved. He

---

[20]Tinnitus is noise, like ringing or whistling, in the ears. Stedman's Medical Dictionary, 1603.

[21]Bursitis is inflammation of a bursa, a closed sac or envelope lined with synovial membrane and containing fluid. Stedman's Medical Dictionary, 221-22. Naproxen is used to relieve mild to moderate pain from various conditions. It can reduce the pain, swelling, and joint stiffness caused by arthritis. http://www.webmd.com/drugs. (Last visited February 12, 2008).

[22]A spur, or calcar, is a small projection from a bone. Stedman's Medical Dictionary, 227.

also noted Fattah had no tinnitus, vertigo, or visual problems. (Tr. 191.)

On January 5, 2006, Fattah went to Barnes-Jewish Hospital for a follow-up for her right ear and neck discomfort. During her last visit, she received Bactrim and Ibuprofen, after which she experienced relief of her symptoms. (Tr. 193.)

On February 7, 2006, Fattah went to Barnes-Jewish Hospital, complaining of a recurrent UTI. She noted increased pain after urinating, which was not typical of a UTI. (Tr. 175.)

On March 6, 2006, Fattah completed a disability report. She was unable to work as of November 1, 2004, because of problems with her back and ear. She provided no other information. (Tr. 87-91.)

On April 24, 2006, Fattah went to Barnes-Jewish Hospital, complaining of a recurrent UTI and chronic heel pain. (Tr. 147-48.)

**Testimony at the Hearing**

During the hearing on August 24, 2006, Fattah, with the help of an interpreter, described her ailments and work history. Two years earlier, she had surgery on her right ear. After the surgery, she experienced pain in her shoulder and ear. She had constant dizziness, accompanied by a rapid heart rate, a tight chest, and hand-shaking. She noted back pain and a continuous urinary tract infection, requiring monthly doctor visits. She had neck pain, lower abdominal pain, trouble with her feet, and right knee pain as well. She took medication for her feet and back, but the medication did not relieve all of her back pain. Finally, she would sometimes feel floaters in front of her eyes. (Tr. 19-27.)

The doctors told her she would need another ear surgery, but was afraid to have any more surgeries. At the time, she could not hear out of her right ear. Fattah also heard voices and saw dead people. She said she cried often. Her doctors referred her to a psychiatrist, which was scheduled for September 2006. (Tr. 28-29.)

Fattah could read and write in English, but not if she was dizzy. She had six children, and lived with her husband and her three youngest children. (Tr. 24-25.) She lived in a one-story home, but going up and

down the basement stairs aggravated her foot pain. Her younger children helped with much of the housework, including preparing meals. Because of the hallucinations, Fattah was unable to do anything around the house. (Tr. 28-31.)

Fattah's husband is disabled, having suffered a stroke. She used to take care of him, but currently her children take care of all his needs. Her children also take care of her, helping to put on her clothes and do her hair. Fattah does not have a driver's license, so friends would often do her shopping. She could only walk around the house, and would sometimes fall from dizziness. She could not stand or sit for long periods, and could lift nothing heavier than a book. Fattah also had difficulty sleeping. (Tr. 31-35.)

During the hearing, Fattah's daughter, Hilveen, also testified. In the previous two years, Hilveen had taken over the household responsibilities, cleaning, cooking, taking care of her siblings, washing her mother's hair, and taking care of her mother. Her mother "used to do everything," but "she's not herself lately." As a result, Hilveen would shop for groceries with a neighbor and then prepare canned soups. (Tr. 38-40.)

Finally, a vocational expert (VE) testified as to Fattah's ability to perform various jobs, given her background and educational level. Assuming Fattah could lift and carry up to fifty pounds occasionally, up to twenty-five pounds frequently, and could sit, stand, and walk for six hours in an eight-hour day, she could perform several jobs of medium work existing in the national economy. There were also jobs involving light and sedentary work that Fattah could perform, such as cleaning or working as a table worker. Assuming Fattah suffered from dizziness, blurred vision, a decrease in hearing, limited shoulder and neck movements, and was at risk for falling, the VE testified that Fattah could not perform any jobs in the national economy on a full-time basis. Assuming Fattah suffered from a recurrent urinary tract infection, the VE testified that Fattah could not perform full-time work. The same was true, assuming Fattah heard voices and saw things. (Tr. 41-47.)

## III. DECISION OF THE ALJ

The ALJ found the plaintiff's allegations of disability inconsistent with the medical evidence. (Tr. 17.) The ALJ noted Fattah suffered from dizziness and a right tympanoplasty, and that these impairments were severe. The ALJ also noted Fattah's complaints concerning ear problems, back pain, difficulty walking, anxiety, and trouble with the English language. (Tr. 12.)

After reciting the claimant's complaints, the ALJ summarized the relevant medical history, chronicling Fattah's medical visits between December 2004, and January 2006. In February 2005, Dr. Khalifa did not diagnose Fattah with a back-related impairment. That same month, Fattah refused a test for caloric stimulation. In September 2005, Fattah told Dr. Jiang that she had no dizziness or ear pain. In November 2005, Dr. Chavez-McGregor found Fattah had normal ears. In December 2005, Fattah refused to have exploratory surgery for her ear. In January 2006, Fattah told Dr. Lieu that she did not have vertigo. (Tr. 12-14.)

The ALJ noted Fattah was able to perform a number of daily activities. Fattah goes to the local church, walks around her home, watches television, cares for her disabled husband, and cares for a four-year old infant. In light of the entire record which included these activities, the ALJ found Fattah had the physical and mental stamina and ability to concentrate, as well the ability to use her arms and legs. The ALJ also believed that her daily activities were inconsistent with a disabling lack of balance. (Tr. 14.)

The ALJ discredited Fattah's complaints concerning her difficulties with the English language. During the hearing, Fattah had answered a question before hearing the translation. In addition, Fattah had completed her naturalization and taken the oath of citizenship, indicating a certain proficiency with the English language. (Tr. 14-15.)

The ALJ discredited Fattah's psychiatric complaints. Fattah did not seek psychiatric treatment or take psychiatric medication. A consultative examiner found she was alert and well oriented. Finally, the ALJ noted that Fattah had not alleged any disabling mental impairments in her application. (Tr. 15.)

The ALJ noted Fattah was not taking any strong medication, despite her allegations of back and ear pain. Despite her alleged impairments, Fattah did not seek regular and sustained treatment for her impairments. No physician had imposed any long term or significant physical or mental restrictions. The ALJ noted Fattah's low income, but found she had never been refused treatment or medication based on an inability to pay. Finally, the ALJ noted Fattah had a history of medical noncompliance, which detracted from the severity of her symptoms. (Tr. 14-16.)

After determining Fattah's alleged impairments were not completely credible, the ALJ concluded that Fattah had the residual functional capacity (RFC) to perform a wide range of medium work. In particular, the ALJ found Fattah had the RFC to frequently lift up to twenty-five pounds, and occasionally lift up to fifty pounds. The ALJ found Fattah could sit, stand, and walk for six hours in an eight-hour workday. Based on this RFC, a vocational expert (VE) testified that Fattah could perform a significant number of jobs in the national economy. The ALJ concluded Fattah was not disabled within the meaning of the Social Security Act and could perform a wide range of work at the medium level of exertion. (Tr. 16-18.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. § 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. § 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. § 416.920(a)(4).

In this case, the Commissioner determined that Fattah was not disabled and could perform a wide range of work at the medium level of exertion.

## V.  DISCUSSION

Fattah argues the ALJ's decision is not supported by substantial evidence. Specifically, Fattah argues the ALJ erred by failing to include a number of her impairments when questioning the vocational expert. Fattah also argues that substantial evidence does not support the ALJ's credibility determinations. She argues the ALJ erred in discounting her testimony and the testimony of her daughter. (Doc. 10.)

**Vocational Expert Testimony**

An ALJ's hypothetical question to the VE must fully describe the claimant's impairments. Chamberlain v. Shalala, 47 F.3d 1489, 1496 (8th Cir. 1995). At the same time, the ALJ's hypothetical question needs to include "only those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006). In this case, the ALJ found that Fattah had the RFC to frequently lift up to twenty-five pounds, occasionally lift up to fifty pounds, and to sit, stand, and walk for six hours in an eight-hour workday. The ALJ did not find Fattah's alleged impairments completely credible. In the hypothetical question to the VE, the ALJ asked what jobs Fattah could perform, assuming she could lift up to

twenty-five pounds, occasionally lift up to fifty pounds, and could sit, stand, and walk for six hours in an eight-hour workday. In other words, the ALJ's question to the VE included only those impairments the ALJ found supported by the record. Under Lacroix, the ALJ's hypothetical question was proper if substantial evidence in the record supported the RFC and the limited impairments found by the ALJ.

Looking to the record, substantial evidence supports the RFC and the limited impairments found by the ALJ. In August 2002, a CT scan revealed Fattah's vertebral alignment was normal and there was no evidence of degenerative disk disease. In December 2002, a physical examination showed no knee effusion and ligament testing was negative. The examination showed no back tenderness, and the doctor recommended a conservative course of treatment, and did not prescribe any heavy medication. See Combs v. Astrue, 243 F. App'x 200, 205 (8th Cir. 2007) (Non-prescription pain medications and over-the-counter medications are inconsistent with complaints of disabling pain). In February 2004, Fattah denied feeling lightheaded, and denied any hearing loss or dizziness. After her surgery in October 2004, Fattah could walk to the bathroom and dress herself. She was alert, calm, and well oriented. In November 2004, a physical examination showed the right tympanic membrane was intact. Notes from December 2004, indicate Fattah could cook, clean, bathe, and shop on her own. In a work history report from December 2004, she noted "helping [her] disabled husband at home."

In February 2005, Dr. Khalifa found no problems with her elbows, wrists, or knees. Her muscle and grip strength were within normal limits. That same month, an oculography showed her ocular motor function was intact and headshake testing was within normal limits. During that visit, Fattah refused caloric testing. In June 2005, a CT scan revealed the inner ear structures of each ear appeared normal. That same month, Fattah told doctors she had no complaints and no pain. In October 2005, her UTI symptoms had resolved. That same month, a CT scan again revealed the inner ear structures of each ear appeared normal. In November 2005, Fattah did not have any UTI symptoms. In January 2006, Fattah experienced relief of her ear and neck discomfort, after taking Bactrim and Ibuprofen.

Looking to the record as a whole, substantial medical evidence supports the ALJ's RFC determination. None of Fattah's doctors ever placed significant restrictions on her activities. See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability."). As noted above, Fattah's doctors never prescribed her strong medication. See Combs, 243 F. App'x at 205. Objective medical tests revealed Fattah's inner ear structures appeared normal and she had no degenerative disk disease along her spine. Her UTIs were not constant, and for several months at a time she had no symptoms. Indeed, the medical notes from October 2004, show Fattah had four bladder infections during that year. From a mental health standpoint, the medical evidence showed Fattah was alert and well-oriented on numerous occasions. Finally, at the hearing, the ALJ found Fattah was able to understand English well enough to respond to a question before hearing the translation. In his decision, the ALJ discounted Fattah's alleged ear pain, back pain, lack of balance, and mental problems. Substantial medical evidence supports this decision. The ALJ's hypothetical question to the VE was proper. Lacroix, 465 at 889.

**Lamya Fattah' Testimony**

The ALJ must consider the claimant's subjective complaints. Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called Polaski factors. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005). These factors include: 1) the claimant's daily activities; 2) the duration, frequency, and intensity of the claimant's pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness, and side effects of medication; and 5) functional restrictions. Id. That said, the ALJ does not need to recite and discuss each of the Polaski factors in making a credibility determination. Casey, 503 F.3d at 695. The ALJ may discount subjective complaints of pain, when the complaints are inconsistent with the

evidence as a whole.  Id.  When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802. When the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination."  Casey, 503 F.3d at 696.

In this case, the ALJ detailed the reasons for discounting Fattah's subjective complaints of pain.  First, the ALJ found Fattah's alleged impairments were inconsistent with the clinical evidence.  During several medical visits, Fattah had no complaints, refused treatment, or the doctors found no evidence of an impairment.  Second, the ALJ noted that some of Fattah's daily activities were inconsistent with a disabling lack of balance.  Third, the ALJ discredited Fattah's difficulties with the English language.  Finally, the ALJ found Fattah's psychiatric complaints not completely credible.

In reaching these conclusions, the ALJ noted Fattah went to church, walked around her house, cared for her disabled husband, and cared for her infant child.  The ALJ also noted that Fattah had never gone to a psychiatrist and had not alleged mental impairments in her disability application.  Fattah responded to one of the ALJ's questions before hearing the translation, belying her difficulty with the English language.  Finally, the ALJ noted that Fattah did not seek regular treatment, refused treatment in some instances, did not take strong medication, and never had her doctors impose significant physical or mental restrictions on her activities.

As noted above, substantial medical evidence supports the ALJ's credibility determination.  CT scans and other medical tests often found no evidence of Fattah's alleged impairments.  Other times, Fattah's symptoms were under control or had resolved.  Fattah also had instances of noncompliance, refusing to have another ear surgery and refusing caloric testing.  She was found to be alert and oriented on several different occasions, and never sought mental health treatment.  The ALJ set out several reasons for discrediting Fattah's testimony and substantial evidence supports these reasons.  Under Casey, the ALJ properly discredited Fattah's testimony.  Casey, 503 F.3d at 696.

**Hilveen Fattah's Testimony**

The ALJ must consider the subjective testimony of a claimant's family members. Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984). In considering their testimony, the ALJ must make a credibility determination. Id. In this case, the ALJ found Hilveen's testimony inconsistent with the medical evidence for the same reasons he found her mother's testimony inconsistent with the medical evidence. The ALJ found that Hilveen's testimony "was merely a recitation of what the claimant had said in testifying." (Tr. 17.)

As noted above, the ALJ properly discounted Fattah's testimony concerning her alleged impairments and limitations. Since Hilveen's testimony merely corroborated Fattah's testimony, the ALJ properly discounted Hilveen's testimony as well. See Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996). In Ostronski, the ALJ found that the testimony of the claimant's mother, sister, and husband merely confirmed the claimant's earlier testimony about her activities. Id. And since the family's testimony conflicted with the medical evidence relating to her functional capabilities, "the ALJ had a solid basis for discounting [the claimant's] lay witness testimony." Id. Looking to Ostronski, the ALJ properly discounted the lay testimony of Hilveen Fattah. See id.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate order is issued herewith.

　　　　　　　　　　　　　　　　　　/S/ David D. Noce　　　　　　
　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on February 15, 2008.

-19-